UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **POLYONE CORPORATION** | ) | |
| 33587 Walker Road | ) | |
| Avon Lake, OH 44012 | ) | |
| | ) | CASE NO. |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE |
| | ) | |
| **YUN MARTIN LU** | ) | |
| 19 Cambridge Lane | ) | |
| Lincolnshire, IL 60069 | ) | |
| | ) | |
| **THOMAS CASTILE** | ) | |
| 1865 Hollyhock Lane | ) | |
| Elm Grove, WI 53122 | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **TIE-LIANG "TYLER" XU** | ) | |
| 1860 Lancaster Lane | ) | |
| Woodridge, IL 60517 | ) | |
| | ) | |
| **POLYMAX THERMOPLASTIC** | ) | |
| **ELASTOMERS LLC** | ) | |
| 3210 Oak Grove Avenue | ) | |
| Waukegan, IL 60087 | ) | |
| | ) | |
| **NANTONG POLYMAX ELASTOMER** | ) | **COMPLAINT** |
| **TECHNOLOGY CO., LTD** | ) | |
| No. 698 Changtai Road, Gangzha | ) | |
| 226011 Nantong Jiangsu | ) | |
| China | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiff PolyOne Corporation ("PolyOne") brings this action against Yun Martin Lu, Thomas Castile, Tie-Liang "Tyler" Xu, Polymax Thermoplastic Elastomers LLC ("Polymax"), and Nantong Polymax Elastomer Technology Co., Ltd. ("Polymax Nantong"), and alleges as follows:

## THE PARTIES

1.     Plaintiff PolyOne is an Ohio corporation with its principal place of business at 33587 Walker Road, Avon Lake, OH 44012.  PolyOne is a citizen of the state of Ohio.

2.     Defendant Polymax Nantong is a Nantong, China-based manufacturer and compounder of thermoplastic elastomers.  Among the principals of Polymax Nantong are Defendants Lu and Xu.

3.     Defendant Polymax is an American subsidiary or sister company of Polymax Nantong, and was formed with many of the same investors in 2013.  Polymax is a U.S.-based manufacturer of TPEs, and competes directly with PolyOne for the sale of TPEs.  Defendants Lu and Castile, along with a third individual, Hrong Roang "Ron" Sheu, constitute the membership of Polymax and Joseph Kutka, another former employee of PolyOne GLS, described in more detail below, has agreed to purchase a three percent interest in Polymax in order to become a co-owner of a venture directly competitive with PolyOne.

4.     Defendant Lu is a Chinese-born U.S. citizen who, upon information and belief, is a citizen of the state of Illinois.  Lu is a former GLS employee who, in 2005, co-founded Polymax Nantong, a China based polymer manufacturer that is competitive with PolyOne in both China and the United States.  In 2013, Lu co-founded Polymax, an Illinois-based TPE manufacturer and compounder, and direct competitor of PolyOne.

5.     Defendant Thomas Castile, upon information and belief, is a citizen of the state of Wisconsin.  Castile, a former PolyOne GLS employee, is a co-owner and employee of Polymax.

6.     Defendant Tie-liang "Tyler" Xu, upon information and belief, is a Chinese-born American citizen, who is a citizen of the state of Illinois.  Xu is an investor and co-owner of Polymax Nantong and Polymax.

## JURISDICTION AND VENUE

7.     The Court has personal jurisdiction over Defendants Lu, Xu, and Polymax because they are citizens of the state of Illinois.

8.     The Court has personal jurisdiction over Defendants Castile and Polymax Nantong, *inter alia*, pursuant to Illinois's long-arm statute, Ill. Stat. §735 ILCS 5/2-209 *et seq*., because Polymax and Castile, or their agents, as described in more detail, *infra*,: (1) transact business in Illinois; (2) committed a tortious act in Illinois; (3) own, use, or possess real estate in Illinois; and (4) with respect to Castile, is a natural person doing business in Illinois, all of which form the basis of the causes of action described herein.  Further, this Court has general personal jurisdiction over defendant Castile under Section 2-209(c) and the United States Constitution, because Castile works in the State of Illinois and has continuous and systematic contacts with the state of Illinois such as the exercise of personal jurisdiction over him by this Court would not offend traditional notions of fair play and justice.  Polymax Nantong has continuous and systematic contacts with the state of Illinois such as the exercise of personal jurisdiction over it by this Court would not offend traditional notions of fair play and justice.

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states, and because Polymax's members are citizens of Illinois

(Lu), Wisconsin (Castile) and Michigan (Sheu).  Upon information and belief, the amount in controversy exceeds $75,000.

10.     Venue is proper as to all Defendants pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this litigation occurred within the district.

## FACTUAL BACKGROUND

11.     PolyOne Corporation ("PolyOne") is one of the world's leading providers of specialized polymer materials, services, and solutions.  It is an integrated company, offering many families of materials to help solve the demanding application needs of its customers.  Each of its divisions works closely with the others in sharing technology, know-how, and marketing experience and opportunities.  Among its divisions are its Geon Performance Materials division, which specializes in manufacturing vinyl resins and compounds, and its GLS division, which specializes in manufacturing and compounding thermoplastic elastomers ("TPEs").  PolyOne merged with GLS in 2008.  (GLS will be referred to as "PolyOne GLS" or "GLS").

12.     PolyOne GLS manufactures TPEs, which are a type of soft plastics.  TPEs are used in a wide variety of applications and sold to a diverse customer base.  TPEs are used in grips, such as on toothbrushes or hammers; synthetic corks, which are used in wine bottles; and cap liners, which are used on the inside of a lid to a plastic bottle to "seal" the bottle correctly.  Some of the TPE formulas are "stock" formulas that are sold to many different customers while others are created especially for particular customers.  All of PolyOne's TPE formulations are closely-guarded trade secrets.

13.     Defendants Lu and Castile are former employees of GLS.  Yun Martin Lu is a Chinese-born American citizen who worked at GLS as a top scientist.  While at GLS, Lu was employed as a formulator, whose job was to develop and test TPE formulations for PolyOne and

its customers.  Lu became one of the principals who started Polymax Nantong in 2005 and later Polymax in the United States.  He is currently one of the owners of both Polymax entities and functions as the chief scientist, president and CEO of both companies.

14.     Thomas Castile is a former employee of PolyOne GLS, and was employed as part of PolyOne GLS's sales and marketing group.  Through his work at PolyOne GLS, Castile was aware of the pricing, costs, and margins of PolyOne GLS, which are considered confidential and trade secrets.  Though formally employed with another company, Castile began to simultaneously work for Polymax "on a handshake" in 2011.  He later in May or June 2013 left his employment with the other company and became an employee and part owner of Polymax.

15.     In or around 2005, Martin Lu and Tyler Xu formed Polymax Nantong in Nantong, China.  The regional Chinese government provided land for Polymax's Nantong manufacturing facilities and its R&D labs.  The business of Polymax Nantong was the manufacture and sale of TPEs, and it became a competitor of PolyOne GLS, which also had operations in China. Polymax Nantong also became a competitor of PolyOne GLS globally, including in the United States.

16.     Lu went to college in China before coming to the United States to obtain multiple advanced degrees: a Master's and Ph.D. in chemistry from the Stevens Institute of Technology in Hoboken, New Jersey, and a MBA from the University of Chicago.  After obtaining his degrees, he worked for PolyOne GLS as a formulator of TPEs.  He left PolyOne to join Xerox, although he did not work with TPEs at Xerox.  Following his time at Xerox, Lu founded Polymax; his only professional experience with TPEs before founding Polymax was through PolyOne.

17.     In 2008, Lu contacted Joseph Kutka, a long-time PolyOne employee, its lead TPE formulator, and Lu's former boss when Lu was employed at PolyOne.  Lu discussed with Kutka

the idea of Kutka coming to work for Polymax.  Kutka, however, as one of PolyOne's key employees, was subject to a non-competition agreement.

18.     In January 2009, Kutka sought an opinion of an Ohio lawyer as to whether his employment by Polymax would violate his Employee Agreement with PolyOne.  The lawyer's written opinion stated that Kutka was banned from working in the TPE area under his non-compete agreement for at least a year after his termination of employment with PolyOne and that if he left PolyOne "to go to Polymax or any other firm making TPEs, PolyOne can sue you." Kutka shared his lawyer's warning, if not letter, with Lu.

19.     At that time, Kutka did not elect to join Polymax, but instead accepted a substantial retention bonus from PolyOne.  At or around the time that Kutka was offered the retention bonus, he was also required to execute a revised Employee Agreement with PolyOne, which again included provisions that prohibited non-competition with PolyOne both during his term of employment and for a period of one year after his employment with PolyOne ended. Unbeknownst to PolyOne, however, Kutka secretly continued a relationship with Lu and Polymax.

20.     In the summer of 2009, Kutka traveled to China, ostensibly on PolyOne business. While there, he secretly diverted to meet with Lu and Xu at Polymax's headquarters in Nantong. He toured the facility, inspected its laboratory and manufacturing lines, and met with employees and technicians of Polymax.  He even posed for photographs with Lu and Xu in front of the Polymax facility.  Kutka then attended the Polymax company outing in China.  Kutka returned to the United States, telling no one at PolyOne what he had done.  PolyOne paid for his airfare to and from China.

21.     In 2010, Kutka began assisting Polymax in the United States. Among other things, he began to recruit talent for Polymax in the United States, and later he helped to facilitate a meeting between a PolyOne trusted vendor and Martin Lu for the purpose of establishing a business relationship between Polymax and the vendor.

22.     Sometime in the fall of 2010, Kutka and Castile began to discuss a major business opportunity for Polymax and for themselves in the United States. At the time, Castile worked for a company headquartered in the Netherlands with offices in the United States, but he had no involvement in the TPE industry and was not competing against PolyOne GLS in that employment. That would all change in December 2010.

23.     The business opportunity Kutka and Castile identified involved Customer X. Customer X manufactures a product using TPEs.[1] PolyOne GLS previously supplied Customer X with TPEs for its product but, due to a patent dispute between Customer X and its competitor, Customer X had been precluded from using TPEs in its product, and PolyOne, therefore, had been unable to continue supplying Customer X. By December 2010, the legal dispute had been resolved, and PolyOne again sought to recapture its business with Customer X.

24.     Unbeknownst to PolyOne, Kutka was acting as a double-agent with respect to Customer X. He and Castile conceived of approaching Customer X with the idea that the new opportunity would be shared with Polymax and Polymax would become the provider of the new TPE products that Customer X would purchase. Kutka, Lu and Castile had all participated in servicing Customer X while at GLS, including the creation of multiple TPE formulations for Customer X and the pricing of its products. Further, Kutka had formulated TPEs for the competitor of Customer X and knew of its formulations, which were now open to Customer X to

---

[1] The identity of PolyOne's customers and the customer's products have been redacted in this public filing due to the confidential nature of the customer relationship and the potential applicability of non-disclosure agreements that PolyOne has executed with its customers.

utilize. Kutka maintained on his company computer the trade secret formulations and pricing model for the competitor's TPE.

25.     Kutka contacted Lu and Xu in December 2010 to arrange a meeting with the two of them and Tom Castile at a restaurant outside Chicago. "Tom and I have been talking for the last few months," Kutka wrote to Lu and Xu, "and would like to investigate whether potential opportunities could exist between our two groups." The four men met at Kawa Japanese Restaurant in Grayslake, Illinois, on December 29, 2010. The Defendants entered into an agreement to work together to establish Polymax's operations in the United States and targeted Customer X as the first "beachhead" customer for the Polymax U. S. venture. They also targeted other PolyOne GLS key customers to solicit and steal. The Defendants knew that Kutka still worked for PolyOne GLS and that his assistance of this venture and participation in the conspiracy was a violation of his Employee Agreement with PolyOne GLS and his duty of loyalty to his employer. They also knew that as a trusted key employee, Kutka had access to PolyOne's most sensitive technical, sales, marketing, pricing and other trade secret and confidential information, including formulations that could be used in the opportunity with Customer X and other PolyOne GLS customers.

26.     Castile documented the conspiracy meeting in an email dated January 4, 2011. He wrote to Lu and Xu, and copied Kutka. He wrote: "Joe and I are both very excited about the potential opportunity to develop the US market together with Polymax. We will be in contact later this month as we progress on our plans as discussed."

27.     Two days later, Kutka sent to Castile the letter from his Ohio attorney that he had obtained in January 2009, the contents of which he had already shared with Lu. Kutka wrote:

8

"Based on my background – I feel that PolyOne would sue. But we can always chance it." Kutka told no one at PolyOne GLS of his activities.

28.     Within three weeks of the December 2010 meeting, Lu, back in China, wrote an email to Kutka and Castile encouraging them on the Customer X project, advising that progress had been made identifying investors to finance "our US operations," and sending a FedEx Nantong Polymax number so that Kutka and Castile could mail packages to China.

29.     After the December 2010 meeting, Castile contacted Customer X and was able to obtain a sample of PolyOne's pellets that it provided to Customer X for analysis, despite that these pellets were provided to Customer X by PolyOne pursuant to a non-disclosure and confidentiality agreement. Castile knew that PolyOne's pellets were confidential and that Customer X should not have provided them to him, but he nonetheless sought and obtained the pellets from Customer X in violation of the confidentiality agreement. On or about January 19, 2011, Castile sent a one kilo sample of PolyOne's pellets to Lu and Xu in China to be analyzed at Polymax Nantong.

30.     In February 2011, Kutka flew to China, purportedly on PolyOne business, but, upon information and belief, met with Xu and Lu while there.

31.     Kutka, while still employed with PolyOne/GLS, found out from one of his customer contacts that Customer X's competitor — the same company that was PolyOne GLS's customer and which was involved in the patent dispute with Customer X – was going out of business and was auctioning its TPE manufacturing lines and lab equipment. Kutka wrote to Lu on March 16, 2011, and informed him that the equipment, including molding machines and compounding equipment, was up for auction and that Polymax "may get at a good price." Kutka and Castile also spoke by phone and used Skype with Lu and Xu to discuss the equipment and

the plans to purchase some or all of it for Polymax's U.S. operation, despite that Polymax would be a director competitor of PolyOne.

32.    Lu asked Kutka to investigate the condition of the equipment.  To do so, Kutka contacted a high level former employee of Customer X's competitor—who he had known as a customer of PolyOne GLS—to discuss the equipment up for auction.  He reported his findings to Lu and Xu in China via telephone or Skype and, as a consequence, Tyler Xu was dispatched by Polymax Nantong to participate in the auction of the equipment in the United States.  Polymax purchased a lab extruder line at the auction and moved the line to China.  Subsequently, Polymax moved the line to its facility near Chicago.

33.    During this time, Lu worked on TPE formulations for Customer X at Polymax's laboratories at Nantong Polymax.  Because he was still an employee of PolyOne GLS Kutka had access to formulations that he and Lu had created for Customer X while both were employed by GLS.  Further, Kutka kept, on his home computer, formulations for the TPE products and highly sensitive pricing models that established pricing for raw materials and manufacturing costs to manufacture the TPE products.  Kutka downloaded these files and tens of thousands more in the Spring of 2013, mere months before he resigned his employment at PolyOne in order to join Polymax.  Upon information and belief, Kutka shared this information with Polymax and the conspirators.

34.    In addition, Lu, as a result of his employment with PolyOne GLS, knew of its trade secret formulations and had worked on them himself while working at PolyOne GLS.  In creating formulations for Customer X in 2011, Lu would have inevitably disclosed PolyOne GLS trade secret information or used the same in coming up with the Nantong Polymax formulations.

35.     As a result, Polymax Nantong began manufacturing TPE pellets for Customer X at the end of 2011 or beginning of 2012, and has sold in the United States millions of dollars in product already, which has been manufactured in China.  All of this activity has been in support of establishing the operations of Polymax in the United States.  Castile claims commissions on the sales in the tens of thousands of dollars, though he has not taken payments yet.

### *The Scheme to Circumvent Kutka's Non-Compete Agreement*

36.     Having successfully established the "beachhead" customer for Polymax in the United States by the summer of 2011, Kutka turned to his plan to leave PolyOne to join Polymax.  Knowing he could not leave PolyOne GLS directly and join Polymax because of the restrictions of his non-compete agreement with PolyOne GLS, Kutka explored "interim" employment outside PolyOne.  He failed to find acceptable employment, writing to a confidential friend that no one could match his salary and benefits at PolyOne GLS.  "One thing I learned," Kutka wrote, "is that after I added all my benefits, I have a pretty good deal with GLS."

37.     In an attempt to circumvent the terms of his non-competition agreement, Kutka sought employment in another division of PolyOne, but outside of GLS.  In the summer of 2011, Kutka moved from PolyOne's GLS division to work for PolyOne's Geon division.

38.     Kutka's move, however, was not genuine.  The Defendants knew of Kutka's plan, and, in an email dated September 2, 2011, Kutka wrote to them that his move to become the Business Development Manager of Healthcare for Geon Performance Materials "has essentially cut my ties being involved with TPEs."

39.     Martin Lu responded by email on September 11, 2011, that, "I certainly also wish that we can working together [sic] again now that your clock started."

40.     Although he was actively and covertly working with Polymax, Kutka continued to have access to highly sensitive PolyOne trade secrets and confidential information through his employment with PolyOne and through his retention of thousands of GLS files he downloaded onto personal data storage devices.  Upon information and belief, Kutka used this access to assist Polymax and the defendants by targeting, soliciting, and improperly obtaining business opportunities from PolyOne GLS's biggest customers.

41.     Beginning in January 2013, Kukta, Polymax, Lu, Xu, and Castile began working together to facilitate Kutka's scheme to leave PolyOne to join Polymax, without losing one day of Kutka's salary and benefits with PolyOne.  Kutka wanted to move seamlessly from PolyOne to Polymax.

42.     Upon information and belief, the Defendants instructed Kutka to obtain an opinion from an Ohio lawyer regarding his non-competition agreement.  Kutka did so, but failed to disclose critical facts to the Ohio lawyer in securing his opinion.  Kutka shared the results of the Ohio lawyer's work with the Defendants.

43.     In an attempt to avoid the application of the non-competition agreement, the Defendants agreed that Polymax should hire Kutka as a Vice President of Operations for Polymax, despite that Kutka had no experience in operations.  This was done so that it would appear that Kutka was not in a position that would "compete" with the technical, sales and marketing positions that Kutka held at PolyOne.

44.     Defendant Castile and Kutka, while Kutka was still employed by PolyOne, recruited another former PolyOne GLS player to join Polymax.  This time, Castile and Kutka solicited a long-time PolyOne GLS consultant to join Polymax in its operations in the United States.  The PolyOne GLS consultant had been a highly paid consultant to GLS and had signed

12

confidentiality agreements while working with them. He developed detailed market analyses and reports for PolyOne GLS on the TPE markets in the United States and globally. He also trained sales and marketing employees of PolyOne GLS. Under his confidentiality agreements, he was exposed to a great deal of confidential and trade secret information belonging to PolyOne GLS.

45.     As a direct result of the recruiting efforts of Kutka and Castile, the GLS consultant signed an agreement to consult for Polymax in the United States over a lengthy period of time for significant compensation and potential bonuses based on customers and business delivered as a result of his efforts.

46.     Defendants Castile and Lu, along with Kutka, also recruited yet another past GLS employee to join Polymax at a dinner at Bobby's Deerfield Restaurant in Deerfield, Illinois, on April 25, 2013.

47.     The former GLS employee wrote after the dinner: "It was great seeing you guys last night. I was left in amazement at what you guys were putting together. Pretty fun stuff."

### *Kutka's Resignation from PolyOne and Intention to Join Polymax*

48.     Almost exactly two years following Kutka's move to PolyOne's Geon division, on or about September 6, 2013, Kutka informed his management at PolyOne that he was considering resigning his position at PolyOne to accept employment with Polymax.

49.     On September 20, 2013, PolyOne submitted a written letter to Kutka in which he was informed that PolyOne would consider Kutka's employment with Polymax, a direct competitor of PolyOne, a breach of his Employee Agreement.

50.     Specifically, PolyOne wrote that Kutka's Employee Agreement provides that the Restricted Territory is defined as all of North America (by virtue of the geographic area to which

13

Kutka was assigned and responsible for at the time of his termination), and because Kutka would be accepting a position with a competitor of PolyOne in North America, the employment would violate the Employee Agreement.

51.     Further, PolyOne wrote that Kutka had received a substantial amount of confidential business and technical information during his long tenure in senior management and that, as a result of his technical and marketing positions, it would be impossible for Kutka to perform similar duties for Polymax without inevitably disclosing PolyOne's trade secret information. All of Kutka's knowledge about the TPE industry and the operation of a manufacturing facility originate from his high-level positions at PolyOne GLS.

52.     In sum, PolyOne specifically warned Kutka that it would consider Kutka "in breach of your Employee Agreement if you become employed by Polymax."

53.     Upon information and belief, Kutka provided a copy of this letter, or a summary of its contents, to the Defendants, who discussed whether it was appropriate to hire Mr. Kutka in light of the circumstances. Defendant Lu, after receiving the opinion from Kutka's attorney wrote that "[t]his is not good news." Nevertheless, despite that the Defendants were well aware that they were interfering with PolyOne's contract with Kutka, nonetheless pressed forward with their plan.

54.     On or about September 23, 2013, Kutka inquired whether he would be permitted to remain employed with PolyOne if he did not accept the position at Polymax. Kutka had no intention of remaining with PolyOne. The sole purpose for his request was to try to provoke his own firing, thus providing him with an argument that his non-compete agreement was not enforceable.

14

55.     On that same day, PolyOne, not knowing of Kutka's fraudulent intentions, assured Kutka that he could continue as an employee with PolyOne and that his services were valued by PolyOne.

56.     Despite these warnings, on November 18, 2013, Kutka announced that he was resigning his employment with PolyOne and informed his supervisors of his decision to accept a position with Polymax as Vice President of Operations.

57.     Kutka's position at Polymax is based in or around Chicago, Illinois.  Because the geographic Restricted Territory under Kutka's Employee Agreement is all of North America (the geographic area for which he was assigned to and responsible for at the time of the termination of his employment) and because Polymax is a direct competitor of PolyOne in the TPE market, Kutka's employment with Polymax is a direct violation of the terms of his Employee Agreement.

## Count I – Misappropriation of Trade Secrets

58.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

59.     PolyOne's trade secret information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and it has been and is the subject of efforts by PolyOne that are reasonable under the circumstances to maintain its secrecy.  For example, PolyOne restricts access to and disclosure of its confidential, proprietary and trade secret information by, among other things, physically securing its facilities and documents, password protecting electronic documents and databases, employing confidentiality agreements and numerous other measures to protect the secrecy of its

information. PolyOne also communicates its expectations regarding use and disclosure of confidential information to its employees through the PolyOne Code of Conduct.

60. Among PolyOne's trade secret information are the formulations for its products. PolyOne sells its plastics to customers in pellet form, which the customers melt and use in customer specific applications. Once these types of plastics are melted and used by a customer in an application, it is very difficult, if not impossible, to reverse engineer the plastic in order to determine its formulation. The pellets, however, can be reverse-engineered.

61. To protect its formulations, PolyOne enters into non-disclosure and confidentiality agreements with its customers that restrict the use of PolyOne's pellets and prevent the customer from providing PolyOne's pellets to any third party. Such confidentiality and non-disclosure agreements are common in the industry, and industry participants are aware that manufacturers' pellets are considered highly confidential property of the manufacturer.

62. By requesting and obtaining PolyOne's pellets from Customer X, the Defendants induced Customer X to breach its confidentiality agreement with PolyOne.

63. Defendants knew, or had reason to know, that PolyOne's pellets that it provided to Customer X were subject to a confidentiality and non-disclosure agreement, but Defendants nonetheless sought and obtained PolyOne's confidential and trade secret information.

64. By requesting and obtaining PolyOne's pellets from Customer X, Defendants misappropriated PolyOne's confidential, proprietary and trade secret information, as a result of which PolyOne has and will suffer loss of valuable intellectual property assets and the loss of customers and other damages.

65. Upon information and belief, Defendants reverse engineered PolyOne's pellets in order to develop a formulation that Polymax ultimately sold to Customer X in competition with

PolyOne.  Upon information and belief, Defendants unfairly used PolyOne's confidential and trade secret information in competition with PolyOne.

66.     Unless restrained and enjoined, Defendants' continued disclosure and use of PolyOne's trade secrets threatens PolyOne with irreparable harm for which it has no adequate remedy at law by depriving PolyOne of control over and exclusive use of the valuable intellectual property assets comprising PolyOne's trade secret information.

67.     As a result of Defendants' misappropriation of its trade secrets, PolyOne has suffered loss of its valuable intellectual property assets and loss of customers and other damages in an amount to be determined but reasonably believed to exceed $75,000.

## Count II – Tortious Interference With Contract

68.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

69.     Defendants were aware of the existence of Kutka's Employee Agreement and were aware that the Employee Agreement contained both non-competition and confidentiality clauses.

70.     While Kutka was still employed by PolyOne, the Defendants wrongly interfered with PolyOne's employment relationship with Kutka by tortiously inducing Kutka to breach his Employee Agreement, provide confidential and trade secret information to Defendants, resign his position with PolyOne, and accept a position with Polymax, all in violation of the Employee Agreement.  Upon information and belief, the Defendants induced, encouraged, and assisted Kutka in recruiting other employees to Polymax, including former employees of PolyOne GLS, all to the detriment of PolyOne and in violation of Kutka's Employee Agreement and duty of loyalty.

17

71.     Defendants, through the conduct described above, have improperly caused disruption to PolyOne's employment relationship with its employee and improperly caused Kutka to breach his Employee Agreement with PolyOne.  This conduct is without privilege or justification and the defendants named herein engaged in this conduct in a willful and malicious manner and with an improper motive and through improper means.

72.     As a direct and proximate result of the foregoing conduct, PolyOne has suffered damages.  In addition, the foregoing conduct is continuing and threatens PolyOne with imminent irreparable harm for which it has no adequate remedy at law.

73.     PolyOne further seeks an award of punitive damages as a result of willful and wanton acts of the Defendants.

## Count III – Tortious Interference With Prospective Relations

74.     PolyOne incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

75.     Through the conduct set forth in this Complaint, including, without limitation, Defendants' use of PolyOne's confidential and trade secret information in the solicitation of Customer X, the named defendants have intentionally and tortiously interfered with PolyOne's reasonable expectation of economic advantage and prospective contractual relationships with anticipated purchasers of products manufactured by PolyOne.

76.     PolyOne had previously been party to a long-standing commercial agreement to supply product to Customer X, and Defendants Lu and Castile were each involved in servicing Customer X for PolyOne GLS while they were employed by GLS.  Lu was involved in the formulation of Customer X's products, while Castile was involved in sales to Customer X.

18

77.     As a result of a patent dispute that required Customer X to change its product formulation, PolyOne lost Customer X's business; however, as a result Customer X's resolution of the patent dispute, PolyOne was again able to supply product to Customer X and, indeed, submitted a bid to Customer X, although the bid was eventually won by Polymax.

78.     But for Defendants' wrongful acts, PolyOne had a reasonable likelihood of obtaining a contractual relationship with Customer X.

79.     Through its improper actions, Polymax has obtained an unfair economic advantage over PolyOne.

80.     The use of PolyOne's trade secret and confidential information in connection with Polymax's work for Customer X evidence an intent to harm PolyOne by competing unfairly and intending to prevent PolyOne's formation of contractual relations with Customer X.

81.     Defendants' conduct was without privilege or justification and was undertaken in bad faith.

82.     PolyOne sustained actual damages as a direct and proximate result of Defendants' willful conduct in tortiously interfering with PolyOne's prospective contractual relations.

83.     PolyOne further seeks an award of punitive damages as a result of willful and wanton acts of the Defendants.

## **PRAYER FOR RELIEF**

Wherefore, PolyOne hereby requests that this Court enter a judgment in its favor and order:

A.  that a preliminary and permanent injunction be entered enjoining the Defendants' use or disclosure of any of PolyOne's confidential or proprietary trade secret information;

B.  that judgment be entered for PolyOne against all defendants for any

compensatory, statutory and related damages, including exemplary damages as

permitted by statute;

C.  that judgment be entered for PolyOne against all defendants for punitive damages;

D.  that PolyOne be awarded all of the costs and attorneys' fees it has incurred in

connection with this action as allowed by statute or common law; and

E.  such other and further relief as this Court deems is just and proper.


Respectfully submitted,

*/s/ Todd A. Holleman*
Todd A. Holleman (Illinois Bar No. 6307584)
*holleman@millercanfield.com*
**MILLER, CANFIELD, PADDOCK AND
STONE, PLC**
225 West Washington, Suite 2500
Chicago, IL 60606
Telephone:  (313) 496-7668
Fax:  (313) 496-8454

*Attorneys for Plaintiff PolyOne Corporation*


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby requests a

trial by jury as to all issues so triable.

*/s/ Todd A. Holleman*
Todd A. Holleman
*An Attorney for Plaintiff PolyOne Corporation*

23588044.1\088888-02185

20