POLYONE CORPORATION,

      Plaintiff,

      v.

YUN MARTIN LU, et al.,

      Defendants.

No. 14 CV 10369

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff PolyOne Corporation developed a custom formula for a type of soft plastic for use in synthetic wine corks. It claims that the formula is a trade secret and that defendants misappropriated the formula by using it to develop their own. PolyOne also brings claims that defendants tortiously interfered with its contract with an employee and its prospective relations with customers, conspired with one of its former employees, and violated the Computer Fraud and Abuse Act. Defendants bring counterclaims of commercial disparagement and violation of the Illinois Uniform Deceptive Trade Practices Act. Now, defendants move for judgment on the pleadings and summary judgment on PolyOne's claims and to exclude the testimony of two PolyOne expert witnesses. PolyOne moves for summary judgment on the counterclaims.

# I. Background

## A. Local Rule 56.1

The facts are largely taken from the parties' Local Rule 56.1 statements of material facts. [336]; [345]; [353]; [367].[1] I consider all material facts admitted unless properly controverted. *See* Local Rule 56.1. For example, one of PolyOne's facts is that certain phone calls took place but does not say what was said on the phone calls. *See* [345] ¶ 15. Defendants admit that records reflect the phone calls, but they also insert the fact that the phone call participants have been friends for over 25 years and deny that the call participants shared formula information (even though the asserted fact said nothing about sharing formulas). *See* [345] ¶ 15. At times, PolyOne responds to defendants' facts in a similar way. *See, e.g.,* [353] ¶ 9. Those facts are not properly controverted—I consider them admitted, and I disregard additional facts or argument inserted into responses.

Defendants move to strike most of the facts that PolyOne submitted in support of its motion for summary judgment because they go to PolyOne's claims, not the counterclaims that are the subject of PolyOne's motion. *See* [345] at 1–3. I agree that PolyOne should have only included facts material to the counterclaims in its statement of facts and included the facts about the trade secret misappropriation in the statement of additional facts accompanying its response to defendants' summary judgment motion. Nevertheless, I will consider them, because there is no prejudice to

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings, except in the case of depositions, which use the transcript page numbers.

defendants in doing so—defendants have seen PolyOne's asserted facts and responded to them. Defendants have not argued, for example, that PolyOne has stolen an opportunity to put forth more facts than allowed under the local rules. The only prejudice defendants point to is that PolyOne's statements of facts "unnecessarily complicate these proceedings and create additional work for [d]efendants and the court." [345] at 2. To be sure, technical violations of Local Rule 56.1, including inappropriately argumentative responses of which defendants are guilty too, do create additional work for the court. But in this case, I exercise my discretion to look past the technicalities to avoid delaying resolution of the substance. *See Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("[I]t is clear that the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." (citation omitted)). The same is true of defendants' complaints that PolyOne's facts are too long and complicated.

I also deny defendants' request for leave to supplement their responses to PolyOne's facts. Defendants provided sufficient responses to the facts and no explanation for why supplementation is necessary.

### B. Facts

PolyOne, a provider of specialized polymer materials, purchased GLS Corporation in 2008. [336] ¶¶ 1–2. GLS manufactured custom formulations of a specific kind of soft plastic called thermoplastic elastomers. [336] ¶¶ 1–2. From around 1999 to 2002, GLS supplied custom-formulated TPE pellets to Nomacorc, a company that makes synthetic wine corks. [336] ¶¶ 11–12; [345] ¶ 13. During this

time, defendants Lu and Castile were working for GLS—Lu as a chemist and formulator and Castile in sales. [336] ¶¶ 23–24.

The development of GLS's TPE formula for Nomacorc was led by Joseph Kutka, [345] ¶ 7, and it took some trial and error over the course of two to three years. [345] ¶ 13. GLS started with a ██████████████[2] SEBS, or styrene-ethlyene-butadiene-styrene block copolymer, but when Nomacorc complained of ██████████, GLS switched to a ███████████████ SEBS and added ████████████ ████████████████████████████████████. [367] ¶¶ 3–4, 8; [344-22] at 34. Both these changes increased the risk of ███████████████. [367] ¶¶ 6, 8, 14. Nomacorc also reported that customers were having difficulty ████████████ ████████████████████████████████████████████████████ ████████████████████████████. [367] ¶ 5. So despite the risk of ████████, GLS ████████████████████████████████████████████ ██████████████████████. [367] ¶¶ 6–7. In around 2002, Nomacorc became involved in a patent dispute with a competitor and stopped using SEBS-based materials. [336] ¶ 13; [345] ¶ 14. Then, in 2010, Nomacorc regained the rights to use SEBS and began the search for a supplier. [336] ¶ 16. By this time, a new potential supplier had emerged.

---

[2] Courts can keep trade secrets confidential, notwithstanding the public right to access the judicial record. *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002). I have tried to omit the arguably secret details from this opinion. *See Union Oil Co. of California v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000). But some of those details are important to the analysis and the parties' respective positions, so I have redacted the matters that could reveal potentially protected trade secrets. A sealed, unredacted version of this opinion will be placed on the docket. The redactions and the sealing of the underlying record will be revisited as the litigation moves forward.

Defendant Nantong Polymax is a China-based TPE manufacturer formed by Lu in 2005. [336] ¶¶ 3, 25. In late 2010, Castile, who had left PolyOne and was working for a different company, informed Lu of the Nomacorc opportunity, which he had learned from a friend at Nomacorc. [336] ¶¶ 24, 26; [345] ¶ 11. Castile began collaborating with Lu in early 2011, and Castile sent him samples of PolyOne's TPV- and TPO-based (not SEBS-based) TPE pellets he received from Nomacorc for testing. [336] ¶¶ 27–28; [345] ¶ 17. At around the same time, Kutka, the lead formulator behind PolyOne's TPE formula, emailed with Castile about the prospect of joining Nantong Polymax. [345] ¶ 15. Kutka forwarded Castile a letter from his attorney about the restrictions in his PolyOne employment agreement and stated that though he felt PolyOne would sue him if he left, they could "always chance it." [345] ¶ 15. In January 2011, Kutka was in contact with Lu and Castile by telephone and email. [345] ¶¶ 15–18. A Nomacorc employee recalled Castile telling him "[s]omething to the effect of [Kutka's] working for us now." [345] ¶ 19. Kutka went on a PolyOne business trip to China the following month. [345] ¶ 21. Around that time, Lu began creating his TPE formula for Nomacorc. [345] ¶ 22. In early March, Polymax prepared its first samples. [345] ¶ 24. Kutka participated in several Skype video conferences and phone calls with Castile and Lu over the next week or two. [345] ¶¶ 24–28. Kutka also told Polymax about an opportunity to purchase compounding equipment that was being auctioned by a Nomacorc competitor. [345] ¶ 29.

Nomacorc received its first Polymax samples in mid-April. [345] ¶ 33. Shortly after, Nomacorc told Castile that when processed, a sample was █████████

███████. [345] ¶ 34. Castile informed Lu about the ███ issue, and the two exchanged emails trying to figure out the cause. [345] ¶ 34. A couple of days later, Kutka and Castile had a series of phone calls, and soon after, Lu came up with two new TPE formulas. [345] ¶¶ 35–36. The new formulas ███████████████ ███████ and added ████. [345] ¶ 37. Lu submitted new samples to Nomacorc and went to the United States to observe Nomacorc's production trials, which were successful for the most part. [345] ¶¶ 40–41. Lu also met with Kutka during his visit. [345] ¶ 43. After the successful trial, Lu made some small changes to the formula, and then Nomacorc reported an ██████ issue. [345] ¶¶ 45–46. Two days after being informed about the issue, Castile had two phone calls with Kutka. [345] ¶ 46. Then Lu created four new versions of the formula. [345] ¶ 47.

PolyOne also submitted TPE pellets for Nomacorc's consideration, using the same formula it used for the Nomacorc supply in the past. [336] ¶ 18. But Nomacorc informed PolyOne that that the pellets did not meet their requirements. [336] ¶ 19. Eventually, Nomacorc chose Polymax to be its TPE supplier, though the pellets required some other modifications before final acceptance. [345] ¶¶ 48–51.

In September 2011, around the time Nomacorc accepted Polymax's pellets, Kutka transferred to a different PolyOne division, believing that it would start the clock running on the non-competition provision in his employment agreement. [345] ¶ 52. Kutka relayed this belief to Lu and Castile and remained in contact with them over the next two years. [345] ¶¶ 52–53. In September 2013, Kutka notified PolyOne that he would be resigning and joining Polymax Thermoplastic Elastomers, LLC (the

recently registered United States arm of Polymax), which he did. [345] ¶ 54; [336] ¶ 5. PolyOne then sued Kutka in the Northern District of Ohio and won a jury verdict against him for breach of contract, breach of the duty of loyalty, and intentional spoliation of evidence. [345] ¶ 54. The jury awarded PolyOne $981,391.40 in damages on those claims, plus attorneys' fees. [345] ¶ 54. PolyOne moved for injunctive relief for its trade secret misappropriation claim against Kutka. [345] ¶ 55. Ultimately, the parties submitted an agreed entry of a permanent injunction and final judgment, which consisted of a monetary judgment of $1,481,391.60 (the jury's award plus $500,000 for attorneys' fees) and a permanent injunction barring Kutka from possessing, using, or disclosing PolyOne's confidential and trade secret information and prohibiting Kutka from working for Polymax. [345] ¶ 56.

## II.   Defendants' Motion for Judgment on the Pleadings

Defendants move for judgment on the pleadings with respect to PolyOne's claims for tortious interference with contract, tortious interference with prospective relations, and civil conspiracy. [315]. "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Such a motion is subject to the same standard as a Rule 12(b)(6) motion to dismiss. *See Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). I must grant a motion for judgment on the pleadings "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Id.* (citation omitted). In resolving a Rule 12(c) motion, I must draw all reasonable facts and inferences in the non-movant's favor and consider only the pleadings, documents

incorporated by reference in the pleadings, and matters subject to judicial notice. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017).

## A.    ITSA Preemption

Defendants argue that the Illinois Trade Secrets Act preempts, at least in part, PolyOne's tortious interference and conspiracy claims. The act "abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the Act itself." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). *See also* 765 ILCS 1065/8(a). It preempts claims "only when they rest on the conduct that is said to misappropriate trade secrets." *Hecny*, 430 F.3d at 404–05. The question is whether the claims would be viable even if the purported "secret" were not confidential. *Id*. at 405.

The breaches underlying PolyOne's tortious interference with contract claim include Kutka's obligation to refrain from aiding PolyOne's competitors while employed and the restrictive covenant preventing Kutka from competing with PolyOne for a period of time after his employment ended. Neither of these bases rely on the misappropriation of trade secrets, which defendants seem to concede, *see* [360] at 2, so the ITSA does not preempt the claim. The ITSA does not preempt the tortious interference with prospective relations claim for similar reasons.[3] The claim is based on PolyOne's prospective relationship with Nomacorc, and defendants argue that the

---

[3] Defendants raise the issue of whether PolyOne adequately alleged "purposeful interference" for the first time in their reply brief. *See* [360] at 3. "[A]rguments raised for the first time in a reply brief are waived." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010). Anyway, the argument is not promising. *See Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999) (explaining that the competitor's privilege "does not privilege inducing a breach of contract").

only allegation of assistance Kutka provided them with respect to Nomacorc is the alleged disclosure of trade secrets. But whether Kutka's disclosure was of a trade secret or not, he would have been violating his contractual obligation not to help PolyOne's competitors. So, the claims are based, at least in part, on grounds other than trade secret misappropriation, and the ITSA does not preempt them. To the extent the tortious interference and conspiracy claims are partially based on trade secret misappropriation, the ITSA preempts those parts.

## B. Tortious Interference with Contract: Preliminary Stages and Remedies

Defendants advance two other arguments with respect to the tortious interference with contract claim—that the preliminary stages doctrine protects Kutka's competitive activity while working for PolyOne and that, given PolyOne's prior litigation with Kutka on the underlying breaches, either judicial estoppel or the single recovery rule prevent PolyOne from collecting damages in this action.

Under the preliminary stages doctrine, "an employee, absent a restrictive covenant, has a right to enter into competition with the former employer upon leaving such employ and that an employee may even go so far as to form a rival corporation and outfit it for business while still employed by the prospective competitor." *Radiac Abrasives, Inc. v. Diamond Tech., Inc.*, 177 Ill.App.3d 628, 636–37 (2nd Dist. 1988). It is inapplicable here, "since that doctrine pertains to an employee's general fiduciary duties to his employer, not to situations where the employee is governed by a restrictive covenant." *Brown & Brown, Inc. v. Ali*, 592 F.Supp.2d 1009, 1048 (N.D. Ill. 2009). Even if Kutka were not bound by a restrictive covenant, Kutka's alleged aid to

Polymax at a time when it was in direct competition with PolyOne for Nomacorc's business can hardly be called a preliminary stage. Defendants attempt to frame the allegations about Kutka's contributions to Polymax as being that Kutka helped to set up PolyOne TPE, which did not exist during the time Kutka is alleged to have helped defendants, but that characterization ignores the allegations that Kutka was assisting Nantong Polymax, which did exist and was directly competing with PolyOne for Nomacorc's business.

Defendants argue that PolyOne's prior litigation with Kutka constrains PolyOne's remedies against them now. PolyOne chose not to pursue damages based on the breach of Kutka's post-employment restrictive covenant in the Kutka litigation, so defendants argue that it is judicially estopped from seeking damages for that breach now.[4] Judicial estoppel prevents litigants from taking inconsistent positions in related proceedings, but it is not inconsistent to request one remedy against one defendant and then another remedy against another defendant. Unlike the cases defendants cite, PolyOne did not argue that it legally could not seek damages on the claim in the Ohio litigation—it just chose not to. *See, e.g.*, *Murray v. Silberstein*, 882 F.2d 61, 66–67 (3d Cir. 1989) (plaintiff judicially estopped from

---

[4] Defendants also suggest that PolyOne cannot both enforce the post-employment non-competition provision of Kutka's employment agreement (in the form of the Kutka injunction) and erase the breach (by receiving damages). But this argument falls under the election of remedies doctrine. *See Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 386 Ill.App.3d 585, 596–97 (1st Dist. 2008). And, as PolyOne points out, election of remedies is an affirmative defense that defendants have waived by not raising it until this point in the litigation. *See Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 739 n.4 (7th Cir. 1990).

claiming damages because he previously received an injunction based on an argument that the Eleventh Amendment barred damages).

Defendants next argue that PolyOne already received a judgment against Kutka based on the breach and cannot recover again. The single recovery rule is that "[a] tort victim can obtain only one recovery for his harm, no matter how many tortfeasors inflicted it." *Janusz v. City of Chicago*, 832 F.3d 770, 774 (7th Cir. 2016) (citation omitted). But there is nothing to suggest PolyOne has actually obtained its recovery—though PolyOne received a judgment against Kutka, there is no evidence that the judgment has been fully satisfied. Defendants cite *Saichek v. Lupa* for the notion that PolyOne "may not divide up [its] claim and bring successive proceedings to obtain additional damages." 204 Ill.2d 127, 140 (2003). But in that case, the plaintiff received full satisfaction of a judgment against one tortfeasor in an earlier action, leading the court to reason that "[b]ecause the judgment has now been satisfied, and because plaintiff is precluded from relitigating the question of her damages, she has already received all that she is entitled to receive for the injuries that gave rise to this litigation." *Id.* at 137. Alternatively, defendants argue that PolyOne's settlement agreement[5] with Kutka satisfied the judgment, but the settlement agreement explicitly states that the agreement "is not intended to and does not equate in any way to an accord or satisfaction of the full final judgment

---

[5] PolyOne points out that defendants' attempt to rely on the settlement agreement is "questionable," because it was not referenced in the pleadings or the subject of proper judicial notice. I only consider the settlement agreement for illustrative purposes, to show that even if I were to consider the settlement agreement in support of defendants' argument, it would not prevail.

amount." *See* [317] at 2.[6] Defendants' argument otherwise is not persuasive, particularly because an accord and satisfaction requires "a shared and mutual intent to compromise the claim." *Saichek*, 204 Ill.2d at 135.

Though the single recovery rule does not bar PolyOne's claim, it may affect the any potential damages it can recover, perhaps by requiring a setoff. Those are issues for another day.

### C.  Conspiracy

Defendants contend that the conspiracy claim is duplicative of the other claims, but "[c]onspiracy alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort." *Real Colors, Inc. v. Patel*, 974 F.Supp. 645, 651 (N.D. Ill. 1997). The complaint includes Kutka and his conduct in the conspiracy, which distinguishes the conspiracy claim from the others that are based on the defendants' conduct.[7] Still, PolyOne will only be able to recover for each injury once, whether under a conspiracy theory, a substantive theory, or both. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 486 (1998).

---

[6] Defendants argue that this provision in PolyOne's settlement agreement with Kutka cannot be binding on them as third parties. [360] at 7 (citing *Saichek*, 204 Ill.2d at 136). But the issue here is whether Kutka's agreement with PolyOne that the settlement would not fully satisfy the judgment against him is binding on Kutka. Because it is, PolyOne's judgment against Kutka is not fully satisfied by the settlement.

[7] Defendants argue that Kutka is not a new defendant because he was named in the Northern District of Ohio lawsuit, which was consolidated into this one. [80]. But defendants did not explain how that affects the analysis—the only appearance Kutka makes in PolyOne's claims in this complaint against defendants is in the conspiracy claim.

### III. Motions to Bar Experts

Defendants move to bar two of PolyOne's experts—Dr. James Rancourt and Dr. Manuel Garcia-Leiner—whose testimony is related to the trade secret misappropriation claim. "Any assessment of the admissibility of expert witness testimony begins with Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*, as together they govern the admissibility of expert witness testimony." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Rule 702 and *Daubert* require me to evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original). In doing so, my role is to function as an evidentiary gatekeeper, deciding whether the expert testimony crosses the threshold of admissibility, but I am not to determine the weight and credibility of the testimony, which is the province of the jury. *Id*. at 780–81. As the party seeking to introduce the expert testimony, PolyOne bears the burden of establishing that it satisfies the *Daubert* standard. *Id*. at 782.

### A. Dr. Rancourt

Dr. Rancourt's opinion is that PolyOne and Polymax's SEBS-based TPE formulas are "substantially similar." As discussed below, similarity between two items can support an inference that one was derived from the other—one source was used to replicate its features into another product.

Dr. Rancourt's opinion is based primarily on the results of a Fourier transform infrared spectroscopy analysis of the TPE pellets that his laboratory performed. [324-1] at 2. According to Dr. Rancourt, different chemicals and polymers have specific

infrared absorbances, or spectral peaks, that show up along the x-axis of an FTIR spectroscopy. [324-1] at 2. So by looking at the specific position of a spectral peak on the x-axis, one can determine the presence of a certain molecular group (or, where there is no spectral peak at a specific position, the absence of a certain molecular group). [324-1] at 2. The intensity of the spectral peak along the y-axis shows the concentration of the molecular group. [324-1] at 3. Through this analysis of the TPE pellets' spectra, Dr. Rancourt found that the pellets share "all of the same molecular groups," meaning the "chemical components" of the two are "substantially similar" (based on the similar locations of the spectral peaks along the x-axis), and the concentrations of the ingredients are "substantially similar" (based on the similar intensities of the spectral peaks along the y-axis). [324-1] at 2–3. Defendants do not contest Dr. Rancourt's qualifications or the reliability of FTIR spectroscopy analysis.

Instead, defendants argue that the FTIR spectroscopy analysis is not relevant to the question of whether the pellets' formulas are similar. There are different levels of generality that could be used to judge similarity. One can compare specific ingredients (SEBS from Supplier X), general ingredients (SEBS), or chemical components (the molecular groups that make up SEBS). Dr. Rancourt's opinion is that the formulas' chemical components are substantially similar, and defendants argue that the question at issue in this case is whether the specific ingredients are similar. *See* [324] at 11 (arguing that Dr. Rancourt "admitted that if two manufacturers used *different* SEBS from different suppliers, that he would nevertheless expect the styrene peaks to be the *same* in the FTIR results" (emphasis

in original)).[8] But, as defendants point out in their summary judgment briefing, PolyOne's trade secret claim is not based on the specific suppliers. *See* [366] at 2 ("Plaintiff has not claimed, and cannot claim that Defendants' formulation uses the same ingredients, suppliers and percentages of composition as Plaintiff's formula."). The question is whether Dr. Rancourt's opinion about the pellets' chemical components is relevant to the claim of misappropriation—namely, whether he has an opinion about similarity that tends to suggest that defendants misappropriated PolyOne's formula to arrive at their own.

Defendants argue that Dr. Rancourt's opinion that the TPE formulas are similar is based on faulty methodology because the FTIR results do not bear any meaningful relation to the ingredients in the formulas. But each of the formulas' ingredients is made up of molecular groups. *See* [324] at 6. So, if the molecular groups of the two formulas are similar, it bears some relevance to whether the formulas' general ingredients are similar (virtually identical infrared spectra suggest similar ingredients, [324-3] at 50:22–51:12, 63:20–64:14), which in turn, could support an inference that defendants used PolyOne's approach to develop their pellets. How persuasive that inference is, I cannot say. But it is at least relevant—and defendants do not argue that Dr. Rancourt is not qualified to make the comparison he made. That defendants disagree with Dr. Rancourt's inference is something they can address at trial. Defendants also argue that Dr. Rancourt's analysis does not specifically address

---

[8] The parties already have evidence of the specific ingredients in the TPE formulas in the form of the undisputed formula lists. *See* [336] ¶ 42.

the three most distinct features of the PolyOne formula—the ████████████

SEBS, ████, and ████████████████—but the alleged trade secret is the entire

PolyOne approach to the TPE formulation, which combines all those things in

addition to the other ingredients. And defendants' argument that Dr. Rancourt did

not engage with the differences between the two formulas is not persuasive, because

Dr. Rancourt does explain differences he noted in the FTIR spectra. *See* [324-1] at 3–

4.

In the alternative, defendants argue that the probative value of Dr. Rancourt's

testimony is outweighed by the likelihood of its prejudicial effect on the jury. *See* Fed.

R. Evid. 403. Specifically, defendants are concerned that Dr. Rancourt's testimony

that the formulas are a "99.9% match" could be unduly prejudicial. Whether Dr.

Rancourt will be able to tell the jury that the formulas are 99.9% identical can be

addressed closer to trial. For the purpose of evaluating defendants' motion for

summary judgment, Dr. Rancourt's underlying testimony is admissible.

### B. Dr. Garcia-Leiner

Dr. Garcia-Leiner's opinions relate to the development history of the PolyOne

and Polymax's SEBS-based TPE formulas—specifically, that (1) Polymax's formula

"substantially derives" from PolyOne's formula and Polymax could not have

developed its formula without access to PolyOne's formula, (2) Polymax's formula

"displays several compositional markers that are functionally identical" to those

found in PolyOne's formula, (3) "Polymax's development efforts reveal access to

[PolyOne's] trade secret and confidential information," (4) Polymax's formula

development "occurred over an extremely short time period compared to normal

product development times observed in the polymer and plastics industry," and (5) Polymax's addition of ██████████████████████████ is not unique. [320-1] at 16–17.

In deciding whether to exclude expert testimony, I must evaluate the expert's credibility and methodology as it relates to specific questions—an expert may be allowed to testify to one question but not another. *See Gayton v. McCoy*, 593 F.3d 610, 617–19 (7th Cir. 2010). Defendants do not specify which of Dr. Garcia-Leiner's opinions they move to exclude but rather base the motion on what they call his "overarching opinion" that "without access to confidential information related to PolyOne's SEBS formulation and manufacturing processes, Polymax would not have been able to develop and produce a material suitable for the desired application, particularly in such a short period of time." [320] at 7–8. Really, this is just the first of Dr. Garcia-Leiner's opinions, though it implicates the third and fourth, so I understand the motion to seek the exclusion of only those opinions. *See* [320-1] at 16–17. In challenging the "substantially derived" opinion, defendants spend most of their briefing arguing against three statements in Dr. Garcia-Leiner's report that they understand to underlie the "substantially derived" opinion—that use of a ███ ████████ SEBS would not be "intuitive" for the Nomacorc application, that ████████████████████ in Polymax's TPE formula is ████ that the use of ███ ████ is a "trade secret," and that Polymax's formula development time was "short." [320] at 8–13. Defendants do not argue that Dr. Garcia-Leiner's opinions are

17

irrelevant but rather that Dr. Garcia-Leiner is not qualified to testify to them and that his methods are not reliable.

Defendants assert that Dr. Garcia-Leiner's experience in polymer science and polymer formulation is not specific enough to qualify him to testify about TPEs, a particular kind of polymer. As an academic, Dr. Garcia-Leiner has multiple degrees in polymer science and engineering, and he has experience testing and evaluating SEBS-based TPEs. [344-26] at 79:6–18; [344-36] ¶ 5.[9] As a commercial scientist, Dr. Garcia-Leiner has formulated hundreds of polymers, including selecting the polymers and additives, experimenting with variations, getting feedback from customers, and evaluating performance in the end use. [344-26] at 86:16–88:9; [344-36] ¶ 7. And as a consultant, Dr. Garcia-Leiner has led projects involving TPEs in which his team analyzed and tested those products. [344-26] at 80:21–81:12; [344-36] ¶ 9.[10] Defendants point out that Dr. Garcia-Leiner has never specifically formulated a SEBS-based TPE in a commercial setting. But although he did not get the knowledge all in one experience, Dr. Garcia-Leiner's combined experiences equip him with the knowledge of both the commercial polymer formulation process and the

[9] Defendants say Dr. Garcia-Leiner's affidavit statement that he has experience formulating SEBS-based TPEs in an academic setting impermissibly contradicts his deposition testimony, which is unclear. *See* [344-26] at 77:1–5, 79:6–18. Because it does not materially affect my decision, I will assume Dr. Garcia-Leiner has not formulated SEBS-based TPEs in any setting.

[10] Defendants argue that Dr. Garcia-Leiner's affidavit contradicts his deposition testimony, where he said he could not recall whether any of his work at his current consulting firm involves SEBS-based TPEs in particular. But Dr. Garcia-Leiner did testify at his deposition that he has experience working on projects with TPEs, whether SEBS-based or not. [344-26] at 78:17–81:12. Defendants have not explained why SEBS-based TPE experience in particular is necessary or why general TPE experience does not suffice for purposes of determining admissibility.

characteristics of TPEs. That is sufficient to qualify him to answer questions about TPE formulation techniques and practices. That Dr. Garcia-Leiner has never formulated the specific kind of SEBS-based TPE at issue in this case is a topic for cross-examination. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility.").

As for reliability, I agree with defendants that the methodology underlying Dr. Garcia-Leiner's opinion that the Polymax TPE formula is substantially derived from PolyOne's formula is not reliable. Dr. Garcia-Leiner's opinion relies on his review of the evidence, including the development histories of the formulas, and his resulting determinations that the two formulas share three distinct features and that the Polymax formula was developed in a "short" time period. *See* [320-1] at 10–11. One factor courts can consider when evaluating the reliability of an expert's methodology is "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Defendants argue that Dr. Garcia-Leiner does not explain whether he considered the obvious alternatives here—that Lu came up with the formula on his own, based on his general skill, experience, and knowledge, or that the formula was based on publicly available information. In fact, they argue, Dr. Garcia-Leiner's report does not consider Lu's background at all, and he did not do a literature search to see whether the allegedly unique features of the formulas are publicly available. PolyOne does not respond to this argument about Dr. Garcia-Leiner's failure to consider

alternatives. "[A]rguments about alternative explanations typically go to weight, not admissibility," unless the expert provides "no explanation" for dismissing the obvious alternative explanations. *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *25 (N.D. Ill. Mar. 31, 2017) (citation omitted). Here, PolyOne has pointed to nothing to suggest that Dr. Garcia-Leiner engaged with the possibility of alternative reasons for the similarity of the formulas or provided even a cursory explanation for why the obvious alternative reasons do not make sense. So, at least at this stage of the litigation, Dr. Garcia-Leiner cannot opine that the Polymax formula was substantially derived from the PolyOne formula.

But just because Dr. Garcia-Leiner's opinion about substantial derivation is excluded does not mean that the opinions underlying it must be excluded too. Dr. Garcia-Leiner's opinion that ███████████████ SEBS was not an intuitive first choice for a TPE formula in this context is appropriately based on his expertise and specialized knowledge as a polymer scientist and formulator. Dr. Garcia-Leiner explained in his deposition:

> The process of Nomacorc, as I understand it, involves coextrusion of SEBS formulation to produce the skin that will coat a wine cork. Typically, when you develop a product for extrusion coding applications, what you're driven by initially is to make sure that the formulation you create can be processed appropriately; can be extruded appropriately. And any polymer scientist will understand that material with a ████████████████ would have a ██████ and as a consequence would be █████████████████. So ██████████████████████ is probably not the first approach.

20

[320-2] at 173:15–174:6. "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data," but, even if relying on experience, an expert must explain herself and cannot just supply a "bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Dr. Garcia-Leiner's explanation amounts to more than a bottom line, and it is within the specialized knowledge of a polymer scientist. Defendants discredit this opinion because it does not consider whether the possibility of using a ███████████ SEBS is generally known, but this opinion is not whether the choice is generally known in the industry, it is whether it is an intuitive first choice. That opinion, though maybe not relevant to the question of whether the formula is a trade secret, is relevant to whether defendants used PolyOne's alleged trade secret because it questions the credibility of Lu's development process.

In opining that ████████████████ in Polymax's TPE formula is ███ Dr. Garcia-Leiner relies not just on his experience but also on sample formulations from the "Plastics Additives Handbook." [320-2] at 151:6–152:22. Dr. Garcia-Leiner's experience as a polymer scientist who has worked with TPEs and his review of a relevant piece of literature are enough to make his opinion reliable. Defendants do not argue that Dr. Garcia-Leiner cherry-picked the sample formulations he used to compare the Polymax formula to or that the handbook is not scientifically accurate. Instead, defendants say the handbook is "unreliable, since it does not address the use of ██████████ used in any TPE application relevant to this case." [320] at 12. That argument goes to the weight and credibility of the opinion, not its admissibility, as

does the fact that Dr. Garcia-Leiner could not identify the exact threshold at which

██████████████ would be considered ███ and that a material data sheet may

indicate that the Polymax formula's ████████ falls within the recommended

range.

Defendants argue that Dr. Garcia-Leiner's opinion that PolyOne's use of ████

████ is a trade secret should be excluded. Dr. Garcia-Leiner cannot testify to

what is and what is not a trade secret, because it is a legal conclusion that experts

are not entitled to make. *See, e.g., Skycam, Inc. v. Bennett*, No. 09-CV-294-GKF-FHM,

2011 WL 2551188, at *5 (N.D. Okla. June 27, 2011) ("[I]n trade secret cases, courts

have permitted experts to testify about what processes and materials were 'unique;'

what information a party possessed; and the custom and usage of the industry—but

not that the information was a 'trade secret.'"). But PolyOne does not claim that ████

████ itself is a trade secret—its claim is based on the combination of the

formula's components—so whether ████████ in particular is a trade secret is

not material. The better question is whether Dr. Garcia-Leiner will be able to testify

as to whether the use of ██████████████████ is a generally

known practice because, as defendants point out, "[h]e did not check any scientific

literature, textbooks, patents or even Google" to reach his conclusion. [320] at 10.[11]

The question is not material to resolving the summary judgment motion, but I will

[11] PolyOne argues that Dr. Garcia-Leiner testified that he did do a literature search. But Dr. Garcia-Leiner testified that he reviewed literature about whether it is commonly known that ██████████████, [320-2] at 122:2–125:8, and that he relied only on his experience to say it is not commonly known that ██████████████, [320-2] at 137:10–141:2.

note that at trial, Dr. Garcia-Leiner will not be able to testify to whether the use of ████████████ is common in the industry without having done any type of investigation into what is known in the industry. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 416 (N.D. Cal. 1999) ("[T]he unrefreshed personal recollection of one person, even if he was once knowledgeable, could not alone be the basis for an expert opinion as to the general knowledge of an entire community almost a decade ago.").

Defendants assert that Dr. Garcia-Leiner's "opinion that Nantong Polymax's development time was 'short' is unsupported speculation and should be excluded," though the argument receives short shrift in the briefing. [320] at 8. Defendants base their argument on Dr. Garcia-Leiner's qualifications, but his experience qualifies him to testify to formula development times. The problem that defendants do not raise is that Dr. Garcia-Leiner does not explain his basis for concluding that Polymax's development time was short. Though he suggests in his deposition that it is based on his experience, he must explain the connection between the experience he is invoking to the conclusion he is reaching. *See also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). For example, one could say, "I have been involved in 100 custom TPE formulation projects, and, in my experience, it typically takes at least one year to complete a project. So based on my experience, Polymax's

development time was short." To the extent Dr. Garcia-Leiner relies only on a comparison between PolyOne's development time (which took years) to Polymax's development time (which took months), that would be an inference that the jurors could draw from those facts on their own, and Dr. Garcia-Leiner's own inference would not be helpful to the jury. Because defendants did not raise this argument and the testimony is not material to my summary judgment decision, I do not exclude the testimony now but caution that the testimony may not be admissible at trial.

## IV.    Motions for Summary Judgment

PolyOne and defendants both move for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citation omitted).

### A.    Defendants' Motion for Summary Judgment

PolyOne's complaint asserts claims against defendants for the misappropriation of trade secrets, tortious interference with contract and prospective

relations, civil conspiracy, and violation of the Computer Fraud and Abuse Act. Defendants move for summary judgment on all claims. [322].

### 1. Misappropriation of Trade Secrets

"In order to establish improper use of trade secrets, a plaintiff must show: '(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation.'" *Destiny Health, Inc. v. Connecticut Gen. Life Ins. Co.*, 39 N.E.3d 275, 282 (Ill. Ct. App. 2015) (citation omitted).[12]

### a. Existence of a Trade Secret

Whether something is a trade secret is "one of the most elusive and difficult concepts in the law to define," so "the question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'" *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (citations omitted). To be a trade secret, the formula must be (1) "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use" and (2) "the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). To assist in evaluating whether information is a trade secret that meets the two statutory requirements, Illinois courts often consider these factors: "(1) the extent to which the information is known outside of the plaintiff's business; (2) the

---

[12] Defendants do not contest the damages element.

extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys*, 342 F.3d at 722.

Defendants do not dispute that PolyOne took reasonable efforts to protect its formulas. [366] at 2. *See also* [345] ¶¶ 6, 13; [367] ¶¶ 1–2. Instead, they argue that the TPE formula's components are generally known. Because the particular kind of SEBS PolyOne uses is a commonly available SEBS product and the concepts of ███ ██████ and ████████████ are each generally known in the industry, they argue, PolyOne's formula is generally known and not a trade secret. This argument mischaracterizes the purported trade secret. PolyOne's trade secret is not any of the particular components of its formula—████████████████████████████ ████████—but rather the combination of those into the formula as a whole. [339] at 2. Even assuming each component of PolyOne's formula is publicly known, the combination may not be. *See 3M v. Pribyl*, 259 F.3d 587, 596 (7th Cir. 2001) ("These manuals and processes, even if comprised solely of materials available in the public domain, have been created by combining those materials into a unified system which is not readily ascertainable by other means.").

PolyOne has provided enough evidence from which a reasonable jury could conclude that its formula is a trade secret. There is no dispute that PolyOne guards the secrecy of its formula. The development history of the formula shows that it took PolyOne years and multiple rounds of testing to come up with it. [345] ¶ 13. PolyOne witnesses testified that some of the formula's components are unique, suggesting that it would be difficult for others to duplicate it. *See, e.g.*, [344-24] at 450:4–451:1 (testimony that "intuitively, you want to put ██████████ into the formulation with █ ██████████" but PolyOne ended up ██████████████); [344-23] at 143:13–24 (testimony that "[s]omebody ordinarily skilled in the art, including me, would not routinely or understand that they should end up going through and using ████ ██████"); [344-26] at 144:17–20 (Dr. Garcia-Leiner's testimony that "the use of ████████████████████, in combination to the use of ██████████ ██████, in combination with the ██████████████████ SEBS, is unique"). And defendants have not pointed to any evidence suggesting that the combination of these features is generally known. Drawing all reasonable inferences from these facts in PolyOne's favor, and keeping in mind that whether information is a trade secret is a difficult question of fact ordinarily reserved for the jury, summary judgment on this element of PolyOne's claim is not appropriate.

### b. Misappropriation

With respect to the SEBS-based TPE formula, PolyOne's theory appears to be that defendants improperly used its formula.[13] Defendants contend that "use"

---

[13] PolyOne is not proceeding on trade secret misappropriation claims related to the potential receipt of SEBS-based TPE pellets by Polymax from Nomacorc or information related to nine

requires PolyOne to prove that "[d]efendants' formula was also not based on public information or [d]efendants' general skill, experience, and knowledge." [323] at 7. For support, defendants cite to this quote: "Plaintiff was entitled to protection only if defendants' new inks were substantially derived from plaintiff's trade secrets and not from public information and Mansukhani's general skill, experience and knowledge." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 331 (7th Cir. 1984). But this is just an articulation of "use," not the addition of a substantive requirement. If PolyOne proves that defendants' products were substantially derived from its trade secret, PolyOne will prove that defendants' products were not substantially derived from public information or general skill, experience, and knowledge.[14]

Defendants argue that "PolyOne cannot rely on circumstantial evidence alone." [323] at 8. But, as we often instruct jurors, "[t]he law makes no distinction between

---

[14] customers and six product lines. [339] at 12. But part of PolyOne's claim is based on the TPO-based TPE formula. PolyOne's theory is that defendants misappropriated its TPO formula by acquiring it through improper means. Though use is one means of misappropriation, it is not a requirement—misappropriation can also occur through improper acquisition or disclosure. *See* 765 ILCS 1065/2(b); *Lane v. Brocq*, No. 15 C 6177, 2016 WL 1271051, at *13 (N.D. Ill. Mar. 28, 2016). "Improper means" includes "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use." 765 ILCS 1065/2(a). PolyOne points to evidence that Polymax received and tested PolyOne TPO pellets it received from Nomacorc, despite the fact that the pellets were subject to a confidentiality agreement. [345] ¶ 17. Defendants raise no argument about whether PolyOne has established that defendants knew about the confidentiality agreement. So the trade secret misappropriation claim based on the TPO-based TPE formula survives.

[14] To the extent defendants are arguing that the misappropriation element would not be met if defendants' formula were substantially derived from PolyOne's trade secret but "also" based on public information or defendants' general experience, that argument fails. *See Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996) ("[T]he user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret." (citation omitted)).

the weight to be given to either direct or circumstantial evidence." Seventh Circuit Pattern Civil Jury Instructions 1.12 (2017). Courts have recognized that circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases. *See RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 876 (N.D. Ill. 2001) ("It is frequently true in trade secret cases that '[m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.'" (citations omitted)). *See also Destiny Health*, 39 N.E.3d at 283; *Sokol Crystal Prod., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994).

To raise a reasonable inference of use of its trade secret using circumstantial evidence, PolyOne need only demonstrate that "(1) [defendants] had access to the secret and (2) the secret and the defendant[s'] [formula] share similar features." *Destiny Health*, 39 N.E.3d 275 at 283. *See also Sokol Crystal*, 15 F.3d at 1432. PolyOne has evidence that defendants had access to its TPE formula—the contact between Kutka, then an employee of PolyOne with access to the formula, and defendants, sometimes at critical points in the development of Polymax's formula, is undisputed. Though defendants claim there is no indication that Kutka and defendants ever discussed PolyOne's formula, a reasonable jury could infer that they did.

PolyOne also has evidence that defendants' TPE formula "share[s] similar features" to its own. PolyOne's experts opined that the two formulas share general ingredients or compositional markers, *see* [320-1] at 16; [324-1], and the parties stipulated to a chart showing the two formulas side by side that includes both the quantities of particular ingredients and the category of each ingredient. [336] ¶ 42.[15] It is undisputed that both formulas use ████ and ██████████████ SEBS. So though the formulas are clearly not identical, it would be reasonable to conclude they share similar features. *See American Can*, 742 F.2d at 327 ("One need not be a chemist to see that the two formulas are quite similar in composition.").

Access and similarity only raise a reasonable inference of use; it is not conclusive evidence. Despite evidence of access and similarity, a jury could still reasonably find that defendants did not use PolyOne's trade secret. Just because someone had access to a secret and ended up making something similar does not rule out the possibility that she came up with it on her own. *See Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976) ("[D]isclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention."). Given Lu's background and experience with TPEs, it could be reasonable for a jury to decide that Lu was just

---

[15] *Loctite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 582 (7th Cir. 1981), explains that "[i]n a chemical patent, there is no way to show that these elements exist in the accused product without utilizing highly technical tests performed by experts," so plaintiff "had to have test results showing the existence of infringing ingredients in specific amounts in [defendant's] products." But in this case, the parties have stipulated to a description of the formulas "showing the existence of [ ] ingredients in specific amounts in" defendants' formula.

more skilled than the PolyOne formulators and came up with his formula faster because of it, without any secret help. Because the evidence lends itself to these two reasonable inferences, the claim survives summary judgment.

### 2. *Corporate Officer Privilege to Tortious Interference*

Defendants argue that the corporate officer privilege protects Lu and Castile, as officers of Polymax, from PolyOne's tortious interference claims. "Illinois recognizes a conditional privilege to interfere with contracts 'where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights.'" *Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651 (7th Cir. 2012) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 157 (1989)). The privilege covers the acts of corporate officers taken on behalf of their corporation, the reasoning being that "[b]ecause the interests of corporate officers . . . are sufficiently aligned with those of the company, they generally cannot be liable in tort when they interfere with the company's contracts for the benefit of the company." *Id.* at 652. The privilege applies to interference with contracts and interference with prospective relations. *See Schuler v. Abbott Labs.*, 265 Ill.App.3d 991, 995–96 (1st Dist. 1993).

But the corporate officer privilege only protects an officer who interferes with her own company's contracts or relationships. *See Swager v. Couri*, 77 Ill.2d 173, 188 (1979) (framing the corporate officer privilege as applying "when a director, officer or shareholder of a corporation is alleged to have tortiously interfered with *the corporation's* contractual relations" (emphasis added)).

Defendants point to one case to suggest that the corporate officer privilege extends to officers who interfere with "the contracts of third parties which affect the corporation." *Langer v. Becker*, 176 Ill.App.3d 745, 753 (1st Dist. 1988). In *Langer*, sales officers at a corporation were alleged to have interfered with a partnership agreement between two of its sales representatives, and so "[t]he performance of [the partners] as sales representatives had a direct financial impact upon [the officers' corporation]." *Id*. The Illinois Supreme Court has not endorsed the expansion of the corporate officer privilege to reach the contracts of third parties, and I am not persuaded that it would do so. But defendants' argument does not prevail even if *Langer* accurately articulates the privilege. Defendants have not made any argument that Polymax had a legitimate interest in PolyOne's contract with Kutka or PolyOne's business relationship with Nomacorc. To the contrary, PolyOne's evidence raises a reasonable inference that Lu and Castile were indeed "outsiders intermeddling maliciously in the contracts or affairs of other parties," and the corporate officer privilege does not protect them. *Swager*, 77 Ill.2d at 189.

### 3. *Intracorporate Conspiracy Doctrine*

Defendants invoke the intracorporate conspiracy doctrine to argue that Lu and Castile cannot conspire with Polymax because they are its agents. *See Buckner v. Atl. Plant Maint., Inc.*, 182 Ill.2d 12, 24 (1998) ("[B]ecause the acts of an agent are considered in law to be the acts of the principal, there can be no conspiracy between a principal and an agent."). However, the doctrine does not apply when the conspirators include people outside the entity. *See Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999) ("[U]nder the intracorporate

conspiracy doctrine a conspiracy cannot exist *solely* between members of the same entity." (emphasis added)).

The conspiracy claim includes Lu, Castile, and Kutka as individual co-conspirators with Polymax. The parties do not dispute that Lu was an agent of Polymax during the time of the conspiracy, but defendants have not provided any argument as to why Castile or Kutka should be considered agents. With respect to Castile, defendants respond to PolyOne's argument that Castile was not an agent of Polymax during the first two years of the conspiracy period by concluding that "there is no dispute that Castile was an agent of Nantong Polymax during the relevant time period." [366] at 10. That is not a sufficient response. With respect to Kutka—who was employed by PolyOne during most of the alleged conspiracy period—defendants provide no argument at all as to why he should be considered a Polymax agent. Defendants have not established that Castile and Kutka were agents of Polymax for the entire duration of the conspiracy, so their intracorporate conspiracy doctrine argument fails.

### 4. *Computer Fraud and Abuse Act*

CFAA allows "[a]ny person who suffers damage or loss" from a violation to bring a civil action against the violator. 18 U.S.C. § 1030(g). PolyOne seems to rely on a violation of § 1030(c)(4)(A)(i)(I), which requires, among other things, proof of "loss to 1 or more persons . . . aggregating at least $5,000 in value." Defendants argue that PolyOne has not shown that it suffered either damage or loss. "Loss" means "any reasonable cost to any victim," including "the cost of responding to an offense" or "conducting a damage assessment." § 1030(e)(11). I agree with the majority view in

this district that "a plaintiff can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA." *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F.Supp.2d 847, 854 (N.D. Ill. 2011) (collecting cites). PolyOne hired and paid a computer forensics company to evaluate Kutka's computer, [367] ¶ 17, but the parties dispute whether that was done only for litigation purposes or whether it was done to assess the potential damage caused by Kutka's CFAA violation. Defendants say that PolyOne "readily acknowledges . . . that the investigation of [Kutka's computer] was in connection with litigation only," [366] at 10, but PolyOne clearly disputes that fact. *See* [339] at 15; [367] ¶ 17. So summary judgment is inappropriate, since the motivations behind PolyOne's retention of the computer forensics company are in dispute.

To be complete, I will note that PolyOne did not establish that it suffered damage. PolyOne's CFAA claim is based on Kutka installing and then uninstalling a computer program, which it argues he did without authorization. Now, PolyOne argues that the act of uninstalling the program constitutes "damage" because it is an "impairment to the integrity or availability of . . . a program." § 1030(e)(8). Removal of a program that PolyOne claims should not have been there in the first place qualifies was not damaging under the statute. There is no indication that the installation or deletion of the program harmed the computer system, or any of the

data or information on it, in any way. But because PolyOne has established loss, it need not establish damage, and the CFAA claim survives.[16]

### B. PolyOne's Motion for Summary Judgment

Defendants bring counterclaims for commercial disparagement and violation of the Illinois Uniform Deceptive Trade Practices Act, and PolyOne moves for summary judgment on them. [309].[17] The two counterclaims are based on essentially the same theory—that PolyOne (through its employees) made false and misleading statements that disparaged the quality of Polymax's goods and services. The legal bases for the claims are also quite similar. "Illinois state courts have held that, in effect, the UDTPA codified the common law tort of commercial disparagement." *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F.Supp.2d 704, 710 (N.D. Ill. 2006) (citing *Crinkley v. Dow Jones & Co.*, 67 Ill.App.3d 869, 876 (1st Dist. 1978)). Both a commercial disparagement claim and a UDTPA claim generally require a plaintiff to show that defendants' statements disparaged its goods, services, or business through false or misleading statements. *See* 815 ILCS 510/2(a)(8) (deceptive trade practice where one "disparages the goods, services, or business of another by false or misleading representation of fact"); *Schivarelli v. CBS, Inc.*, 333 Ill.App.3d 755, 766 (1st Dist. 2002) (commercial disparagement plaintiff "must show that

---

[16] Defendants initially argued that PolyOne did not prove their involvement in the CFAA violation—since it is largely premised on Kutka's actions—but dropped the argument in its reply brief after PolyOne explained that its theory for the CFAA violation is based on conspiracy liability.

[17] Defendants also bring a counterclaim for declaratory judgment, which is not at issue in PolyOne's motion.

defendants made false and demeaning statements regarding the quality of [plaintiff's] goods and services").

For the purposes of this motion, I will make a few assumptions in defendants' favor—that commercial disparagement is a viable claim under Illinois law, that malice is a required element of such a claim, and that respondeat superior applies to hold PolyOne accountable for its employees' statements. The parties dispute whether any of these assumptions are correct. Illinois courts disagree about whether commercial disparagement remains a viable cause of action, and the Illinois Supreme Court has not decided the issue. *See Donnelley Mktg., Inc. v. Sullivan*, No. 01 C 9273, 2002 WL 314631, at *3 (N.D. Ill. Feb. 28, 2002) (describing the debate). For that reason, the precise elements of commercial disparagement are unclear, including whether malice is a required element of a claim. *See Morningware, Inc. v. Hearthware Home Prod., Inc.*, 673 F.Supp.2d 630, 640 (N.D. Ill. 2009) ("[I]t is unclear whether a claim for commercial disparagement under Illinois law requires a showing of malice."). And whether PolyOne employees were working within the scope of their employment is a disputed question on which a reasonable jury could come out either way. But because none of the statements on which defendants base their claims clear the threshold of being false or misleading statements that disparage the quality of Polymax's goods or services, I need not resolve these issues and will instead assume them in defendants' favor.

### 1. Nomacorc

Defendants argue that "[i]t is clear based on this lawsuit and the several depositions of Nomacorc personnel that Nomacorc is well-aware of the ramifications

arising from this lawsuit," [340] at 9; [353] ¶ 24, but defendants do not identify any particular statements or assertions of fact by PolyOne or its employees that disparaged Polymax to Nomacorc. This is because defendants' theory of disparagement related to Nomacorc is based entirely on statements PolyOne has made during litigation. The litigation privilege protects those statements.[18]  "[T]he absolute litigation privilege affords immunity to attorneys (and other participants in the judicial process) from tort liability arising out of statements made in connection with litigation." *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998). The privilege is based on the public policy that "[f]ree access to the courts as a means of settling private claims or disputes is a fundamental component of our judicial system, and 'courts should be open to litigants for the settlement of their rights without fear of prosecution for calling upon the courts to determine such rights.'" *Lyddon v. Shaw*, 56 Ill.App.3d 815, 821 (2nd Dist. 1978) (citation omitted). In recognition of this policy, Illinois courts "reject any effort to extend the tort liability for the wrongful filing of a lawsuit beyond the ambit of an action for malicious prosecution or abuse of process." *Id.* at 822.[19]

---

[18] It is unclear whether a false accusation of trade secret misappropriation is disparaging of one's business or services. For a business like that of Polymax, which relies on having the skill to develop custom formulas, it very well may be, unlike other accusations of alleged copycats. *Cf. Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 993–94 (7th Cir. 2004) ("A pirated product is not necessarily inferior to the lawful original; it may indeed be identical to it. So an accusation of piracy is not, as Peaceable Planet appears to think, product disparagement per se."). In this case, the allegations about trade secret misappropriation are contained in the privileged litigation documents, so I do not reach the issue.

[19] Defendants argue that that "[b]ad faith litigation claims are actionable under the [UDTPA]," [340] at 14, relying on two district court cases—*Mitsubishi Elec. Corp. v. IMS Tech., Inc.*, No. 96 C 499, 1997 WL 630187, at *7 (N.D. Ill. Sept. 30, 1997); *Jac USA, Inc. v. Precision Coated Prod., Inc.*, No. 00 C 3780, 2003 WL 1627043, at *16 (N.D. Ill. Mar. 25, 2003)

### 2. Potential Supplier

Similarly, defendants say a PolyOne employee told a third-party potential supplier for Polymax "about the litigation matter involving Joe Kutka." [353] ¶ 21. In his affidavit, the potential supplier only says that he "learned about PolyOne's case against Joe Kutka" from the employee. [345-21] ¶7. So there is no evidence of what the PolyOne employee told the supplier about the litigation or evidence that anything he said disparaged the quality of Polymax's goods or services or its business. To the extent defendants' claim is that the disparaging comment was that the Kutka litigation existed, that is not actionable because the Kutka litigation did exist and there is no evidence that the PolyOne employee lied to or misled the supplier.

### 3. Company A

When a Company A representative asked Huber, PolyOne's global account manager, about the Kutka litigation, Huber said, "yeah, whatever it is, it's on public record there is a lawsuit out there, you know, there was a filing. If you Googled Joe Kutka and PolyOne, there would be a search thing that came up on your computer if you did that." [353] ¶ 16. That statement does not mention Polymax, let alone disparage its products or services. The only way to understand the statement as disparaging would be to link it to PolyOne's statements in litigation, which are privileged. Further, nothing in Huber's statement is false or misleading—there is a

---

(relying only on *Mitsubishi*). I do not find those cases persuasive. *See PSN Illinois, Inc. v. Ivoclar Vivadent, Inc.*, No. 04 C 7232, 2005 WL 2347209, at *6 (N.D. Ill. Sept. 21, 2005) (explaining that "the *Mitsubishi* court was concerned with the defendant's threats of infringement suits and statements to consumers, competitors, and others that the plaintiff was infringing; these were not statements made in the judicial or administrative process").

public record of the lawsuit and information about the case does come up in a Google search.

Defendants argue that referring customers and potential customers to publicly filed litigation documents somehow strips those documents (and the statements contained within them) of the absolute litigation privilege. In doing so, it cites to several cases involving extrajudicial statements. *See* [340] at 13. But referring people to litigation documents that have remained in the litigation is not an extrajudicial statement. Whether one could take a publicly filed litigation document out of the litigation by disseminating it (such as attaching it to an email or advertisement) is a separate question. *See Kurczaba v. Pollock*, 318 Ill.App.3d 686, 702–03 (1st Dist. 2000). There is no evidence of that in this case.

### 4. Simons

Huber also sent a LinkedIn message to John Simons, a PolyOne customer, about the Kutka litigation, saying that "PolyOne has won a lawsuit against our dear friend Joe Kutka for $2 million in the last couple of months for theft of trade secrets." [340] at 10; [353] ¶ 27. There is a question as to whether Huber's statement is substantially true, given that the judgment amount was actually about $1.48 million and trade secret misappropriation was not one of the claims included in the judgment. Anyway, the statement does not disparage (or mention) Polymax or the quality of its goods, services, or business. Defendant argue that at the time of the statement, Kutka was working for Polymax, so the statement implied that Polymax was involved in trade secret misappropriation. But even viewing the facts in Polymax's favor, no such

implication is apparent—that "our friend" Kutka was on the hook for trade-secret theft does not imply Polymax's complicity.[20]

Because defendants have not pointed to any false or misleading PolyOne statements that disparage their products or services, PolyOne is entitled to summary judgment on their commercial disparagement and UDTPA claims.

## V. Conclusion

Defendants' motion for judgment on the pleadings [315] and motion for summary judgment [322] are denied. Defendants' motion to bar Dr. Rancourt's testimony [321] is denied, and their motion to bar Dr. Garcia-Leiner's testimony [319] is granted in part, denied in part. PolyOne's motion for summary judgment [309] is granted.


ENTER:

Manish S. Shah
United States District Judge

Date: September 28, 2018

---

[20] Defendants say that it is "plain from the statement that Mr. Kutka is well-known to Mr. Simons" and that "there is no indication that Mr. Simons was not aware that Mr. Kutka was working with Polymax." [345] ¶ 59. This turns the burden of proof on its head—it is defendants' claim that Huber's statement disparaged Polymax, so it is defendants' responsibility to prove it.